IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MATTHEW JACK DWIGHT VOGT,

      Plaintiff,

v.                                                      Case No. 15-1150-JWB

CITY OF HAYS, KANSAS,

      Defendant.

**MEMORANDUM AND ORDER**

Before the court are Plaintiff's motion for partial summary judgment (Doc. 85) and Defendant's motion for summary judgment (Doc. 87). The motions are fully briefed and the court is prepared to rule. (Docs. 86, 88, 93, 97, 100, 101.) For the reasons stated herein, Plaintiff's motion (Doc. 85) is DENIED; Defendant's motion (Doc. 87) is GRANTED.

**I. Background**

Plaintiff brought this action for damages under 42 U.S.C. § 1983, claiming Defendant violated Plaintiff's Fifth Amendment right not to be compelled to be a witness against himself in a criminal case. The claim relates to statements by Plaintiff that led to the filing of felony charges and a preliminary hearing against him in Ellis County District Court. The charges were dismissed following the preliminary hearing. In 2015, the Hon. Monti L. Belot dismissed Plaintiff's § 1983 claim, relying on case law that said the privilege against self-incrimination was a trial right that did not apply in pretrial proceedings. (Doc. 29.) On appeal, the Tenth Circuit reversed that ruling,

concluding the privilege applies at preliminary hearings as well as criminal trials.[1] (Doc. 37.) The United States Supreme Court granted a writ of certiorari and heard arguments on the issue, but it subsequently dismissed the writ as improvidently granted, leaving the Tenth Circuit's mandate as a final ruling. *City of Hays, Kan. v. Vogt*, 138 S. Ct. 1683 (Mem) (May 29, 2018).

**II. Facts**

The court finds the following facts to be uncontroverted for purposes of summary judgment.

Defendant is a municipal corporation in Ellis County, Kansas, and is duly organized under the laws of Kansas. Don Scheibler is the Chief of the City of Hays Police Department (HPD). His duties include supervising HPD employees. Brandon Wright is a lieutenant for the HPD. His duties include supervising patrol officers (including Plaintiff) and conducting internal investigations. (Doc. 86 at 1-2.)

Plaintiff was employed as a police officer with the HPD for eight months in 2007, and then again from November 1, 2009, until his resignation on January 2, 2014. During that time, Plaintiff came into possession of a knife while on a criminal damage call on East 16th Street in Hays.

Plaintiff applied for a job with the City of Haysville Police Department in October 2013. The application process required a polygraph examination, which Plaintiff agreed to take. In the course of that examination, Plaintiff disclosed that he had gone "on a call and found a Smith and Wesson folding knife but he didn't turn it in as found property because he needed a knife so he took it home and kept it" and "still [had] the knife in his possession." (Doc. 88 at 4.)

---

[1] In addition to his claim against the City of Hays, Plaintiff also originally asserted claims against the City of Haysville and four individual officers. The Tenth Circuit affirmed Judge Belot's dismissal of the claims against Haysville and the individual officers. Accordingly, the City of Hays is the only remaining defendant. (Doc. 37 at 42.)

The polygraph examination was followed by an interview with Haysville Chief of Police Jeff Whitfield. Whitfield extended a conditional job offer to Plaintiff, saying he could have the job provided he resolved the knife matter by disclosing his retention of the knife and turning it over to the HPD. Whitfield indicated Haysville would need to verify Plaintiff's compliance with that condition. (Doc. 86 at 3.)

Two days later, on December 11, 2013, Plaintiff met with HPD Chief Scheibler to advise him of his intention to take the job with Haysville. Plaintiff told Scheibler he had been given a job offer and was resigning. He told Scheibler of Haysville's condition that he disclose his retention of the knife and turn it over. He informed Scheibler that Haysville told him he had to "make that right" with HPD and that Haysville would contact Scheibler to make sure he had done so. Plaintiff told Scheibler he found the knife somewhere in the gutter while working for HPD and kept it as his duty knife. (Doc. 88 at 2-3.)

Scheibler took the knife and instructed Plaintiff to "cut a case," meaning to prepare a found property report about the knife. Plaintiff wrote a report on December 11 that stated, "A black Smith and Wesston [sic] folding pocket knife was located in the 100 blk. E. 16th while investigating another call." Plaintiff was aware that under departmental policies, he was not supposed to keep any property found on the job. (*Id.*; Doc. 88 at 3.)

Plaintiff turned in a resignation letter to Scheibler on December 12, 2013, formally notifying Chief Scheibler that he had accepted an offer of employment with the Haysville Police Department and was offering his resignation to the HPD, effective January 2, 2014. (Doc. 88-6.)

Scheibler assigned Lt. Wright to do a professional standards investigation (PSI), the purpose of which is to find out if an officer has violated a departmental policy. Scheibler intended

3

to have the PSI completed to provide documentation to Haysville that Plaintiff had "made this right."

Wright reviewed Plaintiff's found property report. He then called Plaintiff in for an interview on December 17, 2013. Plaintiff was on duty at the time. The interview was recorded. Wright did not give Plaintiff a *Miranda* warning or a *Garrity* warning.[2] The door to Wright's office was closed. Wright told Plaintiff his report was "simple and vague" and said he needed details about the case. Wright asked if Plaintiff was willing to do that. Plaintiff indicated he was but asked the purpose of the investigation. Wright said he was investigating an internal policy violation. According to Plaintiff, he believed he would be terminated for insubordination if he did not answer Wright's questions, because he perceived that the HPD was a paramilitary organization where insubordination was not tolerated. Plaintiff told Wright he had been dispatched on a criminal damage call one-and-a-half or two years earlier, and that after taking a report on 16th Street, he found the knife in the gutter while walking back to his car. Plaintiff said he picked it up, noted it was rusted and torn up, and said he later cleaned it and used it on duty because he did not have a good pocket knife. He said he believed the knife was not involved in the property damage offense because it was covered by leaves and had been in the gutter for some time. (Doc. 86 at 5-7; 88 at 4-6; 93-5.)

Wright told Plaintiff that he could not tell him what would happen, indicating that Plaintiff's actions were a violation of policy. He said he wanted to get Plaintiff's report completed more accurately and would see if he could find the owner of the knife. Plaintiff asked what details Wright wanted in the report. Wright instructed Plaintiff to add the approximate time and location where he found the knife to his report. Plaintiff added a sentence to the report stating, "The knife

---

[2] *See Garrity v. New Jersey*, 385 U.S. 493 (1967) (a government threat of loss of employment to obtain incriminatory evidence against an employee violates the Fourteenth Amendment).

4

was found in the south gutter with the blade closed approximately in the middle of the block," and added that the incident occurred between May 1, 2010, and May 30, 2010. (*Id.*)

Wright told Chief Scheibler what he learned from his interview. Scheibler was able to identify the criminal investigation in which Plaintiff obtained the knife by performing a computer search using the following information: (1) the incident was in the 100 block of East 16th; (2) there was a criminal damage report; and (3) it involved Plaintiff. Plaintiff had first disclosed that he acquired the knife in the course of a criminal damage call when he answered Wright's questions. There was only one such criminal damage report. It involved a pickup truck with its tires slashed and paint scratched. Wright reviewed that case and called the victim, Ian Mabb. Wright asked Mabb if the incident involved a knife. Mabb said he had handed a knife that he found to the officer. Plaintiff's narrative report of the incident on April 28, 2012, did not mention a knife. There was an audio recording of Plaintiff's encounter with Mabb in HPD's records indicating Plaintiff received the knife from Mabb. Wright reported these findings to Scheibler, who told him to stop the PSI investigation because the matter would be referred for a criminal investigation. Wright submitted his PSI report to Scheibler on December 18, 2013. (Docs. 86 at 7; 88 at 7-9.)

Scheibler referred the matter to the Kansas Bureau of Investigation (KBI) for a criminal investigation.[3] Scheibler and Wright told KBI Agent Mark Kendrick what they knew about the case and gave Kendrick the information they had gathered in their investigation. Scheibler informed the Hays city manager that the PSI investigation revealed the knife was likely turned over to Plaintiff in the course of a felony damage investigation in 2012. Scheibler recommended that Plaintiff be suspended with pay pending completion of the criminal investigation. (Doc. 88-25.)

---

[3] The reference included another matter disclosed by Plaintiff in his polygraph examination, but the other matter is not relevant to the issues presented here.

5

Plaintiff agreed to talk to KBI Agent Kendrick, with Plaintiff's attorney present, on January 2, 2014. Plaintiff told Kendrick he found the knife in the gutter in 2010 or 2011, and said he could not remember for sure if there was a criminal damage call, but if there was, he had already taken care of it when he found the knife. Plaintiff said he was cleaning the knife at the police department when Sgt. Greenwood saw him, and Plaintiff told Greenwood he found the knife but was not going to cut a case on it. Plaintiff said Greenwood asked him if he knew the policy, to which Plaintiff said he did, and Greenwood said "okay" and left. (This was a reference to a departmental policy prohibiting officers from converting found property to their own use and requiring them to open a case and tag such property.) Kendrick asked Plaintiff if he recalled getting the knife from Ian Mabb in 2012. Plaintiff said he did not recall that. Sgt. Greenwood was subsequently interviewed and said he did not recall anything about a knife and would not have let Plaintiff get away with not following a policy. (Doc. 88 at 10-11.)

Plaintiff was charged in Ellis County District Court with two felony counts of interference with law enforcement, by concealing evidence and by making a false report. Kendrick was the complainant on the charging document. Plaintiff retained a lawyer to defend him. A preliminary hearing was held on October 16, 2014, at which Scheibler and Kendrick were called as witnesses by the Ellis County Attorney. Scheibler and Kendrick testified about Plaintiff's statements concerning the knife. Scheibler testified they were able to link the knife to a particular criminal damage call based on the information Plaintiff provided to Wright. Ian Mabb testified about his encounter with Plaintiff. Neither Plaintiff nor his counsel objected to use of these statements or asserted that their use violated Plaintiff's Fifth Amendment privilege against self-incrimination. Plaintiff did not testify at the hearing. On November 21, 2014, a magistrate judge filed an order

finding no probable cause for the charges. On February 23, 2015, a district judge affirmed the dismissal of the charges. (Docs. 86 at 8-10; 88 at 12-13.)

### III. Summary judgment motions

Plaintiff seeks a partial summary judgment with respect to three elements of his § 1983 claim. He first argues the undisputed facts show that Defendant's actions were taken under color of state law within the meaning of § 1983. Second, he contends the incriminating statements were used against him in a criminal case contrary to the Fifth Amendment. Lastly, he argues the evidence shows the statements were "compelled" by Defendant within the meaning of the Fifth Amendment. (Doc. 86.)

Defendant raises four arguments in its own motion for summary judgment. It first argues that no Fifth Amendment violation occurs unless and until a person's compelled statements "are introduced against the defendant at a criminal trial," which did not happen here.[4] Second, it contends Plaintiff was not compelled to make a statement. Defendant argues the statements were not coerced because it did not threaten Plaintiff with removal from office. Additionally, it argues the statements were not compelled because Plaintiff had already stated he was resigning when he made the statements. Third, Defendant argues Plaintiff waived his privilege against self-incrimination by failing to invoke it before answering questions and writing his report, or by failing

---

[4] Although this argument appears contrary to the Tenth Circuit's panel opinion, Defendant contends the Tenth Circuit "focused upon *when* a 'criminal case' began, and [the fact] that pretrial proceedings (such as a probable cause hearing) were part of a criminal case." By contrast, Defendant maintains this argument turns upon the assertion that use of compelled statements at a preliminary hearing does "not render someone a 'witness against himself' within that criminal case." (Doc. 88 at 17-18.) This argument cannot be sustained in light of the panel's ruling that "[t]he Fifth Amendment is violated when criminal defendants are compelled to incriminate themselves and the incriminating statement is used in a probable cause hearing," and that Plaintiff "has adequately pleaded a Fifth Amendment violation consisting of the use of his statements in a criminal case." (Doc. 37 at 2, 25.) *But see id.* at 43 (Hartz, J., concurring) ("Some of the questions we have not answered are … can there be a violation when such use does not cause a criminal sanction….")

to object to use of the statements at the preliminary hearing. Finally, Defendant argues Plaintiff has failed to cite evidence that Chief Scheibler or Lt. Wright had ultimate policy-making authority for the City of Hays, or that the alleged violation was caused by a city policy.

**IV. Discussion**

Under 42 U.S.C. § 1983, any person who, under color of state law, deprives another person of a right secured by the Constitution or laws of the United States shall be liable to the party injured. Plaintiff claims Defendant is liable for depriving him of the Fifth Amendment privilege against self-incrimination, which provides that "[n]o person shall … be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.[5]

The § 1983 claim asserted by Plaintiff requires him, among other things, to cite evidence from which a jury could reasonably find that he was "compelled" by Defendant to give the statements later used against him at the preliminary hearing. *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humbolt Cty.*, 542 U.S. 177, 189 (2004) ("To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled.") In the prior appeal, the Tenth Circuit noted that Plaintiff had alleged that "the Hays police chief conditioned Mr. Vogt's continued employment as a Hays police officer on his documenting the facts related to the possession of the knife…." (Doc. 32 at 36.) That allegation, which was taken as true for purposes of the appeal, was based solely on the complaint and not upon evidence. (*Id.*) For reasons explained herein, the court concludes Plaintiff has failed to cite evidence supporting that allegation or otherwise tending to show that his statements to the HPD were compelled within the meaning of the Fifth Amendment.

1. *Contours of the Fifth Amendment privilege in governmental employment investigations*.

---

[5] The Fifth Amendment is applicable to the States by virtue of the Fourteenth Amendment. *Chavez v. Martinez*, 538 U.S. 760, 766 (2003) (citation omitted.)

The Fifth Amendment privilege against self-incrimination extends beyond not being involuntarily called as a witness against oneself in a criminal prosecution. It also grants a person a privilege "not to answer official questions put to the person in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). A witness protected by the privilege may rightfully refuse to answer official questions unless and until he is protected at least against use of his compelled answers, and evidence derived therefrom, in any subsequent criminal case against him. *Id.* at 78.[6]

In *Garrity*, a state official investigating whether police officers had improperly "fixed" traffic tickets questioned the officers after warning each one that: 1) anything the officer said might be used against him in any criminal proceeding; 2) he had a privilege to refuse to answer if the disclosure would tend to incriminate him; but 3) if he refused to answer, he would be subject to removal from office. *Garrity*, 385 U.S. 493, 494 (1967). The Supreme Court held that the officers' statements were compelled and that the Fifth Amendment prohibited use of the statements in subsequent criminal proceedings. The officers had been given the choice "either to forfeit their jobs or incriminate themselves," a choice that was "the antitheses of free choice to speak out or remain silent." *Id.* at 497. The Court said the resulting statements "were infected by the coercion inherent in this scheme," such that they were not voluntary, nor were they the product of a valid waiver, because duress is present "[w]here the choice is 'between the rock and the whirlpool.'" *Id.* at 497-98.

---

[6] The government must at least provide a grant of "use immunity" protecting the individual from the use of his statements, and from any evidence derived from the statements, in any criminal proceeding. The government need not provide "transactional immunity," which accords full immunity from prosecution for the offense to which the compelled testimony relates. *See Kastigar v. United States,* 406 U.S. 441, 452-53 (1972).

9

A year after *Garrity*, the Supreme Court held that the Fifth Amendment prohibited New York from terminating the employment of a police officer for refusing to waive his privilege against self-incrimination. The officer was advised of the privilege but told that if he did not sign a waiver, he would be fired. *Gardner v. Broderick*, 392 U.S. 273, 274 (1968). The Court held that the privilege "does not tolerate the attempt … to coerce a waiver of the immunity it confers on penalty of the loss of employment." *Id.* 279. The Court noted, however, that answers could be lawfully compelled if the person were granted immunity from use of the compelled testimony (or its fruits) in a criminal prosecution. *Id.* at 276.

In *Lefkowitz*, the Supreme Court examined a statute which provided that if public contractors refused to waive Fifth Amendment immunity, their existing contracts could be canceled and they could be disqualified from future contracts. The Court said this did precisely what *Garrity* prohibited – compel testimony that had not been immunized. *Id.,* 414 U.S. at 82. There was no material difference between the threat of job loss to the employees in *Garrity* and the threat of contract loss to the contractors, such that the testimony was in fact compelled, and a waiver "secured under threat of substantial economic sanction cannot be termed voluntary." *Id.* at 82-83. The Court reiterated that a state could compel incriminating answers if it supplied immunity to the person, and that if immunity were supplied, the state could insist that employees answer questions about their job or suffer the loss of employment. *Id.* at 84. But absent immunity, answers elicited upon the threat of the loss of employment are compelled and inadmissible in evidence. *Id.* at 85.

In *Minnesota v. Murphy*, 465 U.S. 420 (1984), the Court discussed circumstances in which the Fifth Amendment privilege is not "self-executing" and must be asserted. The case involved a probationer who was legally required to meet with his probation officer and be truthful in all

matters. In response to questioning from the officer, the probationer admitted having committed a rape and murder, crimes for which he was then indicted. In reversing a state court decision suppressing the probationer's statements, the Supreme Court emphasized that the answers of a witness "are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of privilege." *Id.* at 427. The Court said it had long acknowledged that:

> "[t]he [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment."

*Id.* (citations omitted.)

*Murphy* reviewed a series of decisions establishing that "in the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." *Id.* (citations omitted.) Such an individual may "lose the benefit of the privilege" even without a knowing and intelligent waiver of it, and despite the government knowing that its requested disclosures may be incriminating. "If a witness – even one under a general compulsion to testify – answers a question that both he and the government should reasonably expect to incriminate him, the Court need only ask whether the particular disclosure was 'compelled' within the meaning of the Fifth Amendment." *Id.* at 428. A witness confronted with such questions "ordinarily must assert the privilege rather than answer if he desires not to incriminate himself." *Id.* at 429. If he asserts the privilege, he may not be required to answer absent an assurance that the statements will not be used against him in a criminal proceeding. But if he chooses to answer, "his choice is considered to be voluntary since he was free to claim the privilege and would suffer no penalty as the result of his decision to do so." *Id.* The Court recognized an exception for confessions obtained from suspects who are in police custody, but

concluded the probationer was not in custody for purposes of *Miranda*: "Since [the probationer] was not physically restrained and could have left the office, any compulsion he might have felt from the possibility that terminating the meeting would have led to revocation of probation was not comparable to the pressure on a suspect who is painfully aware that he literally cannot escape a persistent custodial interrogator." *Id.* at 433.

*Murphy* went on to distinguish the "penalty cases" (such as *Garrity*) where a state had sought to induce a person to forgo the Fifth Amendment privilege "by threatening to impose economic or other sanctions capable of forcing the self-incrimination which the Amendment forbids." In most of those cases, the attempt to override the witnesses' privilege was unsuccessful, and the Court had ruled the state could not then constitutionally make good on its threat. *Murphy*, 465 U.S. at 434. Where a threatened individual instead "succumbed to the pressure placed upon him, failed to assert the privilege, and disclosed incriminating information," the Court had ruled that the individual had not waived the privilege by responding to questions rather than invoking his right to remain silent. *Id.* at 435. It was "[t]he threat of punishment for reliance on the privilege" that distinguished these penalty cases from the ordinary case where a witness was merely required to appear and give testimony. *Id.* Thus, in *Murphy* the state could require the probationer to appear and discuss matters affecting his probationary status without giving rise to "a self-executing privilege." By contrast, if a state, "either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation," then it would have created "the classic penalty situation," and "the failure to assert the privilege would be excused" and the statements deemed compelled. *Id.*

*Murphy* also examined whether the conditions of probation imposed by the state - including an obligation to tell the truth and a threat of revocation for failure to do so - impermissibly

12

compelled the probationer to make a statement. The Court noted the state had not attempted to define the precise contours of the obligation to respond to questions, and the conditions on their face said nothing about the probationer's freedom to decline to answer questions. Nor did the conditions contain any suggestion that probation was conditional upon waiving the Fifth Amendment privilege. Additionally, the probationer did not seek clarification of whether he could assert the privilege without penalty, even though "[a]t this point in our history virtually every schoolboy is familiar with the concept, if not the language, of the [Fifth Amendment]." *Id.* at 437. The Court found no reasonable basis for concluding that the state attempted to attach an impermissible penalty to the exercise of the privilege against self-incrimination, and that was true "[w]hether we employ a subjective or an objective test…." *Id.* In sum, because the probationer "revealed incriminating information instead of timely asserting his Fifth Amendment privilege, his disclosures were not compelled incriminations." *Id.* at 440.

Some courts, in apparent reliance on the "subjective or objective" reference in *Murphy*, have concluded that when a non-custodial witness has not invoked the privilege, the witness's statements are not protected by the Fifth Amendment unless the witness shows: "(1) that he subjectively believed that he was compelled to give a statement upon a threat, and (2) that his belief was objectively reasonable at the time the statement was made." *United States v. Gannaway*, 477 F. App'x 618, 2012 WL 1859528, **3 (11th Cir. 2012). *See also United States v. Friedrick*, 842 F.2d 382, 395 (D.C. Cir. 1988); *United States v. Trevino*, 215 F. App'x 319, 2007 WL 295505 (5th Cir. 2007). The Tenth Circuit has not weighed in on the standard.

2. *Plaintiff was not subjected to custodial interrogation*. As an initial matter, the court concludes that Plaintiff was not in the custody of the HPD when he made incriminating statements to Chief Scheibler and Lt. Wright. In *Miranda v. Arizona*, 384 U.S. 436, 467 (1966), the Supreme

13

Court found that without proper safeguards, custodial interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." When a person is subjected to custodial interrogation without proper warnings and a valid waiver, the person's answers are presumed compelled and must be excluded from criminal proceedings. *Oregon v. Elstad*, 470 U.S. 298, 317 (1985.) A person is in custody for *Miranda* purposes when he is arrested or his freedom of action is curtailed to a degree associated with a formal arrest. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984). Plaintiff makes no claim that his freedom was restricted to a degree associated with a formal arrest. On the contrary, he emphasizes that Lt. Wright informed him he was only investigating an internal policy violation – i.e., an employment matter - rather than a criminal matter. (Doc. 93 at 25.) Plaintiff was not in custody merely by virtue of the fact he was called in to speak to his supervising officer about his possession of the knife. *Cf. Murphy,* 465 U.S. at 430 (probationer forced to meet with probation officer was not in custody.) Because Plaintiff was not in custody, no presumption of compulsion arises out of his interview with Lt. Wright, and the absence of any *Miranda* warning or affirmative waiver of the privilege does not dictate a finding of a Fifth Amendment violation.

3. *There is no evidence reasonably suggesting Plaintiff was compelled to make a statement*.

Based on *Murphy* and cases such as *Gannaway*, *supra*, the court finds Plaintiff must cite evidence from which a jury could reasonably conclude that he subjectively believed he was being threatened with imposition of a significant sanction (e.g., job loss) for asserting a Fifth Amendment privilege, and that such a belief was objectively reasonable under the circumstances.

Plaintiff says he believed he would be fired if he did not respond to Lt. Wright's questions. He argues this was so because 1) Wright said he needed more information and directed Plaintiff to supplement his report; 2) the intimidating circumstances of the interview (in a closed room and tape-recorded); 3) the HPD is a paramilitary organization where insubordination is not tolerated; 4) Wright informed him he was investigating a policy violation and not a criminal matter; and 5) the Hays personnel manual provides that insubordination is misconduct that may subject an employee to discipline including termination. (Doc. 93 at 25.) But even if Plaintiff subjectively believed he would be punished for choosing to remain silent, he cites no evidence to show that such a belief was objectively reasonable. Plaintiff cites no evidence that Defendant in any way expressly or impliedly threatened him with a sanction for asserting a Fifth Amendment privilege. Neither Chief Scheibler nor Lt. Wright ever stated or suggested that Plaintiff was not free to invoke the Fifth Amendment privilege or that he would be subject to discipline or punishment if he did so. On the contrary, after Wright informed Plaintiff that he needed questions answered because Plaintiff's report was vague, Wright asked Plaintiff whether he was "willing to do that," implying he did not have to do so. Plaintiff indicated that he was, just before he asked the nature of the investigation. Wright said he was investigating whether there was a policy violation. Plaintiff then answered Wright's questions.[7] Plaintiff points to nothing in Wright's statements that a reasonable person could interpret as precluding a right to remain silent or threatening punishment for exercising such a right. Similarly, nothing in Defendant's Police Manual (Doc. 93-7) or Personnel Manual (Doc. 93-10) indicates that invoking a Fifth Amendment privilege not to answer a question would be grounds for punishment.

---

[7] Almost immediately after Wright asked Plaintiff if he was willing to provide details about the knife, and clarified that he was investigating a policy violation, Plaintiff made a statement about how he found the knife in the gutter on 16th Street during a criminal damage call.

15

Plaintiff cites the paramilitary nature of the HPD and its potential punishment for "insubordination" to support his claim of compulsion.[8] These facts, however are not material to the issue. As an initial matter, it might be pointed out that virtually all employees are subject to discipline for failing to follow a supervisor's orders, regardless of whether they are in a paramilitary organization. But even assuming that principle was more rigidly applied at the HPD than elsewhere, there is still no evidence that Defendant gave Plaintiff any order that precluded him from asserting a Fifth Amendment privilege or that suggested he would be sanctioned for doing so. In essence, Plaintiff is relying on the fact that a right to remain silent was never discussed, mentioned, or alluded to when Wright conducted his interview. But that absence weighs against an inference of compulsion, not in favor of it. As the Supreme Court noted, "virtually every schoolboy" is familiar with the right to remain silent, and a police officer whose duties include explaining that right to others would surely be familiar with it. Despite that, Plaintiff never attempted to invoke the right or to seek clarification of the consequences of attempting to invoke it. In the absence of some objective indication from Defendant that Plaintiff would be punished if he invoked the privilege, no reasonable inference of compulsion arises from the existence of Defendants' policy of punishing insubordination.

Plaintiff also cites *United States v. Friedrick*, 842 F.2d 382 (D.C. Cir. 1988), as a similar case that shows his statement was compelled. But *Friedrick* bears no resemblance to this case. The defendant in that case was an FBI agent who was required to make a number of compelled statements under promises of immunity from prosecution. After a series of such interviews, prosecutors again interviewed the defendant and made "obvious reference[s]" to his immunized

---

[8] Defendant's Personnel Manual provides that "Refusal to abide by any lawful official regulation or order, [and] failure to obey any proper direction made by a supervisor or department head" may be grounds for termination. (Doc. 93-10 at 51.)

status, but they stopped short of promising immunity. After examining the convoluted circumstances surrounding these interviews, the court found the defendant reasonably believed during the last interview that he was still being compelled to make a statement under a grant of immunity. *Id.* at 396-402. Plaintiff also cites *McKinley v. City of Mansfield*, 404 F.3d 418 (6th Cir. 2005) as a similar case involving a "classic Fifth Amendment violation." (Doc. 93 at 25.) *McKinley* was similar to *Friedrick* in that the officer was likewise compelled to make statements under a promise that the statements would not be used in a criminal prosecution. *Id.* at 423. In a first interview, the officer was given a form stating:

> Because this is an administrative and not a criminal investigation, the Division of Police will not use any of the answers or information gained from the interview in any criminal proceeding against you. * * * You are further advised that you are hereby ordered and required to fully and truthfully answer all questions asked of you in this interview. * * * Your failure to comply with this order constitutes your being in violation of the Rules and Regulations of the Division of Police.

*Id.* In a second interview, the officer was told he was "still under *Garrity*," meaning he was again promised his statements could not be used in a criminal proceeding but he could be terminated for failing to answer job-related questions. The Sixth Circuit found a genuine issue of fact as to whether the officer's statements were compelled. *McKinley* is distinguishable because the officer in that case was promised use immunity and was forced to give up his right to remain silent by an express warning that his employment could be terminated if he did not "truthfully answer all questions." Neither of those things occurred here.

*Garrity* and other cases establish that if a state provides an employee with immunity against the use of statements in future criminal proceedings, it can then lawfully compel the employee to answer job-related questions, including by threatening to terminate him if he does not answer. Plaintiff seems to be suggesting he believed he was in such a situation, in part because Lt. Wright told him he was only investigating a policy violation. But any such belief was not objectively

17

reasonable. Defendant never threatened to discipline Plaintiff for electing to remain silent. *Cf. United States v. Goodpaster*, 65 F. Supp. 3d 1016, 1026 (D. Or. 2014) (when the government threatens to punish an employee for silence, it has in effect elected to inhabit its role as employer and must provide immunity.) Moreover, Wright's clarification that he was investigating a policy matter did not reasonably imply a promise of immunity against the use of Plaintiff's statements in a future criminal proceeding. Plaintiff cites no evidence of an HPD policy or practice, express or implied, of providing use immunity to officers who make statements in PSI inquiries, nor does he claim that Kansas law provides such an immunity. *Cf. State v. Mzhickteno*, 8 Kan. App. 2d 389, 390, 658 P.2d 1052, 1054 (1983) (officers were compelled to make statements in internal investigation; chief of police testified a refusal to answer questions would have prompted imposition of discipline).

Perhaps Plaintiff felt some uncertainty about invoking his right to remain silent when Lt. Wright interviewed him. That does not mean his statements were compelled. Plaintiff undoubtedly felt pressure to answer the questions, in part because he had already voluntarily disclosed that he had improperly retained a knife, a fact that could, if unrefuted, subject him to discipline. But it is "[t]he threat of punishment *for reliance on the privilege*" that distinguishes improper compulsion from "the ordinary case in which a witness is merely required to appear and give testimony." *Murphy*, 465 U.S. at 435 (emphasis added). The material question is whether some form of official compulsion denied Plaintiff "a free choice to admit, to deny, or to refuse to answer." *Salinas v. Texas,* 570 U.S. 178, 185 (2013) (citation omitted.) No evidence is cited to show that Defendant improperly coerced Plaintiff into giving up the option of refusing to answer questions. The Fifth Amendment does not prohibit a witness from testifying voluntarily in matters which may incriminate him. If he desires the protection of the privilege, "he must claim it or he

will not be considered to have been 'compelled' within the meaning of the Fifth Amendment." *Murphy*, 465 U.S. at 427 (citation omitted).

Because the uncontroverted facts show Plaintiff chose to answer questions in the absence of any official compulsion denying him a free choice to refuse to answer, his claim for unlawful deprivation of his Fifth Amendment rights fails as a matter of law. In view of this finding, the court need not address the additional arguments raised by the parties in their briefs.

IT IS THEREFORE ORDERED that Plaintiff's motion for partial summary judgment (Doc. 85) is DENIED; Defendant's motion for summary judgment (Doc. 87) is GRANTED. The clerk is directed to enter judgment in favor of Defendant dismissing Plaintiff's claims on the merits. IT IS SO ORDERED this 26th day of April, 2019.

                                              ___s/ John W. Broomes_____
                                              JOHN W. BROOMES
                                              UNITED STATES DISTRICT JUDGE